IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**BRANDY KEY**                                                                                          **PLAINTIFF**

**V.**                           **CASE NO. 4:19-cv-00647-JTK**

**ANDREW SAUL,** *Commissioner*,
**Social Security Administration**                                                       **DEFENDANT**

## ORDER

### I.     Introduction

Plaintiff Brandy Key applied for Title II disability insurance benefits on March 28, 2017. She alleged a disability onset of November 29, 2016 due to injuries from a car accident. After her claim was denied initially on June 20, 2017 and upon reconsideration on November 30, 2017, Key requested a hearing. An Administrative Law Judge ("ALJ") conducted her hearing via video on November 13, 2018.  Following the hearing, the ALJ issued a decision finding Key not disabled from November 29, 2016 through September 30, 2018, the date she was last insured for purposes of Title II benefits. (R. 192-209). The Appeals Council denied Key's request to review the ALJ's decision. (R. 1-6). The ALJ's decision now stands as the final decision of the Commissioner, and Key has requested judicial review.

For the reasons stated below, the Court reverses the Commissioner's decision and remands for further review. Since the Court reverses based on the ALJ's credibility determination regarding Key's subjective complaints, it will focus its background section on the parts of the record relevant to that determination.

## II.     Background

### a. Key's Treatment History for Shoulder, Back, and Neck Injuries

On November 29, 2016, Key was the passenger in a vehicle that was struck from the side. She was treated at the White River Medical Center ("White River") emergency room that day and diagnosed with cervicalgia, strain of muscle/fascia/tendon at neck level, left shoulder pain, and unspecified muscle/fascia/tenon at her right shoulder/upper arm. (R. 679). She then visited Sherwood Urgent Care with complaints of shoulder and neck pain. (R. 823). While there, Eric Haertling (APN) prescribed her pain medication and advised her to get MRIs and return later if the pain did not improve. (R. 823). On December 5, 2016, she returned to Haertling complaining of increased back pain. (R. 824). Concerning her prescriptions, she said the codeine made "her face flush" and she was not taking the Flexeril (muscle relaxer) because "she [was] scared it will make her sleepy." (R. 824). Haertling then gave her a dexamethasone injection and prescribed her Robaxin and hydrocodone-acetaminophen. (R. 826).

Key received an MRI of her left shoulder at White River Radiology on December 21, 2016 which showed "[d]iminutive long head of the biceps tendon within the bicipital groove which could be related to a high-grade partial tearing." (R. 711). She returned to Haertling on December 22, 2016 with her MRIs, and he referred her to Dylan Carpenter, an orthopedic specialist. (R. 836).

On January 5, 2017, Key visited Dr. Dylan Carpenter at Medical Park Orthopedic, and he diagnosed her with Myofascial pain syndrome, right shoulder pain, and right biceps tendon tear. (R. 726). Dr. Carpenter referred Key for physical therapy and a right shoulder MRI and scheduled a follow-up once she got her MRI. (R. 726). Five days later, Key had her first physical therapy visit with Batesville Therapy Clinic upon Dr. Carpenter's referral. (R. 880). After a discussion of her diagnosis and treatment goals, the occupational therapist's notes state that Key "actively

participated in the creation of the current goals and agrees to the current treatment plan" which involved therapeutic exercises two to three times a week for six weeks to increase both range of motion and stability. (R. 884). On January 17, 2017, Key went to Arkansas State Health Alliance to get the right shoulder MRI that Dr. Carpenter referred her for. (R. 727). She then returned to Dr. Carpenter with her MRI on January 19, 2017. He diagnosed her with Osteoarthrosis of the A/C Joint and told her to continue with her physical therapy and possibly return for another dexamethasone injection. (R. 731).

On February 6, 2017, Key went to Dr. Chase Smith at the University of Arkansas for Medical Sciences ("UAMS") Orthopedic Clinic with complaints of continuing shoulder pain. (R. 733). He diagnosed her with bilateral shoulder pain, recommended a left bicep sheath injection and told her to come back with her MRIs so he could analyze them. (R. 738). Key also underwent the dexamethasone injection. (R. 738). She then visited the UAMS Spine Clinic with complaints of neck and back pain. (R. 742). At that visit, Dr. Monir Tabbosha diagnosed her with subacute neck pain and whiplash injury. (R. 746). She referred Key to receive more physical therapy and pain management treatment. (R. 746).

Key returned to Dr. Smith at UAMS Orthopedic for a follow-up visit with her MRIs as originally requested. (R. 758). Dr. Smith diagnosed her with bilateral shoulder pain as well as AC joint arthritis. (R. 758). After discussing further treatment options since she had "failed to fully respond to conservative treatment," she agreed to undergo a left shoulder arthroscopy surgery. (R. 759). On March 21, 2017, Key returned to Dr. Smith for the arthroscopy. (R. 764). During the procedure, Dr. Smith discovered a Type 1 SLAP tear and diagnosed Key with shoulder impingement syndrome. (R. 772-73, 776). After the procedure, Dr. Smith told her to return to the clinic within ten to fourteen days for a recheck. (R. 773). Upon Dr. Smith's referral, Key went

back to Batesville Therapy Clinic to start another round of physical therapy on March 27, 2017. (R. 899). Her new six week plan included one-on-one physical therapy visits at the clinic which she attended on March 27, March 29, April 4, April 11, April 18, and April 20, 2017. (R. 885, 887, 889, 895, 898, 901). On March 30, 2017, Key also returned to Dr. Smith for the post-operative follow-up appointment. (R. 782). After examining the incisions and removing the sutures, Dr. Smith said she could remove her arm from the sling in the next week or two and should return in four to five weeks for a recheck. (R. 784).

On April 6, 2017, Key went to White River's Pain Management Clinic ("White River Pain Clinic") upon Dr. Tabbosha's referral. (R. 789). While there, Dr. Praveen Pakeerappa told Key to continue with her medications and physical therapy and get new MRIs. (R. 791-92). The following day, Key got new MRIs of her spine at Chenal MRI. (R. 794). Dr. David Harshfield, the radiologist who took the MRIs, diagnosed Key with a Chiari malformation in her spine. (R. 795).

On May 4, 2017, Key returned to Dr. Smith for a post-operative follow-up. She was still wearing a sling and claimed she had not fully regained motion. (R. 1012). Dr. Smith included in his notes: "I want her to come out of her sling and start using her shoulder more. I think she can be more aggressive with therapy, working on both active and passive range of motion and strengthening. I want to see her back in 4-5 weeks for a recheck." (R. 1012).

On May 5, 2017, Key went back to the White River Pain Clinic. (R. 970). She complained of muscle pain and her inability to rest even with her home exercise, pain medication, and muscle relaxants. (R. 970). She received trigger point steroid injections for myofascial pain and was instructed to keep a pain diary and return for a follow-up appointment. (R. 970).

On May 17, 2017, Key visited Dr. James Dustin Taylor at Batesville Spine and Health with complaints including neck pain, stiffness, mid back pain, and left shoulder pain. (R. 905). Dr.

4

Taylor diagnosed her with a variety of impairments including dislocation of unspecified cervical, abnormal cervical posture, cervicalgia, myalgia, dislocation of unspecified thoracic region, abnormal posture, postural kyphosis of the thoracic region, muscle spasms of back, and thoracic spine pain. (R. 911). Key returned to Dr. Taylor's office the following day to review the findings and receive treatment including massage therapy, spinal adjusting procedures to correct subluxations, extraspinal adjusting procedures to correct subluxations, cervical traction, and laser therapy for the cervical and thoracic regions. (R. 914-15). This treatment continued during routine visits on May 22, May 23, May 25, and June 5, 2017. (R. 916-30).

On June 8, 2017, Key visited Dr. Smith at UAMS for another follow-up. She said her pain had improved but she was still having some limitations in range of motion and chronic neck issues. (R. 1017). Dr. Smith told her to be more aggressive "with working on range of motion," opined in his notes that "[s]he really has no limitations in regards to her shoulder", and told her to come back in two months for a recheck with Dr. Pearce. (R. 1018).

On June 9, 2017, Key had her follow-up appointment with Dr. Pakeerappa at the White River Pain Clinic. (R. 972). During that visit, she received another round of trigger point steroid injections for myofascial pain. (R. 972). She returned to the clinic once more on July 5, 2017 complaining of constant pain and feelings of "aching, cramping, sharp, burning, [and] numbing." (R. 974).

On August 17, 2017, Key had her fourth follow-up visit at UAMS Orthopedics, this time with Dr. Charles Pearce. (R. 1022). She told Dr. Pearce her pain was getting better, but she ran out of physical therapy visits and had "been unable to work on range of motion and strengthening due to taking care of her 2 sons over the summer." (R. 1024). She also told Dr. Pearce she had been seeing an outside neurosurgeon for treatment of her Chiari malformation and had been receiving

5

trigger point injections at the White River Pain Clinic. (R. 1024). She received another steroid injection during the visit and was told to continue with range of motion and strengthening exercises. (R. 1026). Dr. Pearce told her to follow up in six weeks. (R. 1026). In her brief, Key says she returned for a follow-up with UAMS orthopedics on October 5, 2017 and received another injection, but the Court cannot find proof of this visit in the record. *Doc.* 11 at 9.

On February 20, 2018, Key visited Arkansas Spine and Pain for a new patient consultation with Dr. David Harshfield. (R. 1066). She came with complaints of continuing neck, back, and left shoulder pain. (R. 1066). Dr. Harshfield found no tenderness, atrophy, or limitations on range of motion in Key's left and right shoulders. (R. 1067). During that appointment, Dr. Harshfield suggested she try perineural injection therapy and see how she responds. (R. 1068). She agreed with receiving the initial injections, and Dr. Harshfield told her to return in a month. (R. 1068). She returned on March 26, 2018 for her follow-up and saw Dr. Julio Olaya. (R. 1062).

### b. Key's Work History

According to Key's work activity report, she was most recently employed as a preschool substitute teacher at the Batesville School District from August 15, 2016 until November 29, 2016. (R. 561). She states she left because of her physical and mental conditions resulting from the car accident. (R. 564). During her hearing before the ALJ, Key testified she was "getting ready to sign a contract" to become a full-time classroom teacher with the Batesville School District. (R. 219). Prior to that, she worked as a cashier at Tractor Supply Company from July 1, 2013 until January 15, 2014. (R. 561). She states "[t]he job at Tractor Supply ended because of my pregnancy." (R. 564). She then became a stay at home mother when her second son was born in 2014. (R. 230). She also worked for a bank after her oldest son was born, but he started having ear infections when he was two years old so she stayed home to take care of him. (R. 236-37).

### c. Key's Daily Activities Report

In Key's function report from November 23, 2017, she stated she has to "move around and change positions and rest [a lot] during [the day] to keep the pain from getting [worse]." (R. 609). While she can perform daily tasks such as dressing, bathing, feeding herself, and driving when necessary (R. 610), she says her husband cooks daily and does most of the indoor and outdoor household chores. (R. 611).

### III.   The ALJ's Decision

Since Key sought Title II disability insurance benefits, the ALJ first considered her eligibility and found she last met the insured status requirements on September 30, 2018. (R. 197). The ALJ then engaged in the five-step analysis to determine whether Key was disabled. *See* 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found she had not engaged in substantial gainful activity between the alleged onset of November 29, 2016 and her date last insured of September 30, 2018. (R. 197). At step two, the ALJ found Key had the severe impairments of "degenerative disc disease, degenerative joint disease, abdominal pain, obesity, depression and anxiety." (R. 197). At step three, the ALJ found that none of Key's impairments met the severity of those found in 20 CFR Part 404, Subpart P, Appendix 1. (R. 198). Thus, the ALJ proceeded to step four and determined Key's residual function capacity ("RFC") to be the following:

> The claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant cannot frequently reach overhead bilaterally. The claimant can perform semi-skilled work. The claimant can perform work where interpersonal contact is routine and superficial; complexity of tasks is learned by experience; involves several variables; using judgment within limits; and the supervision required is little for routine and detailed for non-routine tasks.

(R. 201). In reaching this RFC, the ALJ considered Key's subjective complaints that

> she could no longer work because of chronic abdominal, neck, back, and shoulder pain. She explained that she could not sit, stand, or walk for prolonged periods or lift and carry heavy objects. The claimant reported that she frequently changed

positions throughout the day because of pain, described frequent headaches, difficulty raising her arms above shoulder level and problems using her hands to perform gross and fine manipulations because of pain, numbness, and weakness.

(R. 202).

The ALJ then listed some of Key's daily activities: she "relayed that she could care for her personal needs, prepare simple meals, manage her medications and medical care, perform some light household chores with frequent breaks, and drive when necessary, but relied on her husband and children to shop for groceries and perform heavier chores." (R. 202). In weighing Key's subjective complaints, the ALJ also stated he gave careful considerations to the following factors:

1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
3. Type, dosage, effectiveness, and adverse side-effects of any pain medications;
4. Treatment, other than medication, for relief of pain;
5. Functional restrictions;
6. The claimant's daily activities; and
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

(R. 202-203).

As to Key's work history, the ALJ stated she "had an inconsistent work history prior to her alleged onset date… Such a work history raised a question as to whether the claimant's continued unemployment was actually due to medical impairments rendering the claimant's allegations of debilitating pain and total disability less persuasive." (R. 203).

The ALJ then turned to her history of medical treatment and stated the following:

The claimant sought and received some treatment since alleging disability. Medical sources prescribed narcotic, neuropathic, and anti-inflammatory medications to manage her musculoskeletal pain and psychotropic medications to treat her symptoms of anxiety and depression throughout the adjudicative period. However, the undersigned notes that the claimant's medical file includes significant gaps in the treatment history as well as periods of non-compliance.

> Post-operatively medical sources managed the claimant's shoulder pain conservatively. While the claimant's medical file included reference to epidural steroid injections, medical sources did not recommend surgical intervention to address the claimant's cervical disc disease.
>
> The claimant was not under the care of a mental health professional and was only intermittently prescribed psychotropic and or anxiolytic medications during the adjudicative period by her primary care physician.
>
> Such a course of treatment is not entirely consistent with her subjective allegations of severe, debilitating pain, weakness, numbness, depression, and anxiety rendering the claimant's assertion of total disability less persuasive.

(R. 203). Then, the ALJ addressed the objective medical evidence regarding Key's alleged physical ailments:

> More importantly, the objective medical evidence did not fully support the claimant's complaints; these records failed to demonstrate the presence of pathological clinical signs, significant medical findings, or neurological abnormalities, which would establish the existence of a pattern of pain or debilitating symptoms of such severity that precludes the claimant from engaging in all substantial gainful activity.
>
> Specifically, while diagnostic images of the claimant's cervical spine demonstrated evidence of multi-level degenerative changes resulting in moderate neural foraminal narrowing, there was no evidence of spinal cord stenosis or nerve root impingement. Similarly, while physical examinations revealed some limitation in range of motion of the claimant's cervical spine and left shoulder, there was no evidence of significant motor weakness, muscle atrophy, sensory loss or other significant neurological deficits, and straight leg raise testing was consistently negative. Post-operative images of claimant's shoulders were normal, however, there is some evidence of residual left arm weakness, muscle atrophy, and restricted range of motion.

(R. 203-204).

The ALJ went on to document Key's medical visits for her musculoskeletal issues between November 2016 and March 2018. (R. 204-205). He specifically noted that "[p]ost-operative progress notes dated August 17, 2017, indicate that the claimant's pain, range of motion, and motor strength had improved… Examination of the claimant's left shoulder revealed mild residual weakness; the claimant's right shoulder was normal as were x-rays bilaterally." (R. 205). Thus,

9

relying explicitly on Key's work history, substantial gaps in treatment and non-compliance, and a lack of objective medical evidence, the ALJ made the following conclusion regarding Key's subjective complaints about her impairments:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 205).

### IV. Discussion

#### a. Standard of Review

In reviewing a denial of benefits, the Court must determine whether the Commissioner's findings are supported by substantial evidence. *See Johnson v. Astrue,* 627 F.3d 316, 319 (8th Cir. 2010). This standard is "less than a preponderance, but sufficient for reasonable minds to find it adequate to support the decision." *Id.* Ensuring that substantial evidence supports the Commissioner's decision means the Court must affirm the denial of benefits "even if the evidence supports inconsistent positions, as long as the evidence supports the Commissioner's position." *Id.* (citations omitted).

#### b. Credibility Determination

An ALJ must consider the following factors when evaluating the credibility of a claimant's subjective complaints:

(1) the claimant's daily activities;
(2) the duration, intensity, and frequency of pain;
(3) the precipitating and aggravating factors;
(4) the dosage, effectiveness, and side effects of medication;
(5) any functional restrictions;
(6) the claimant's work history; and
(7) the absence of objective medical evidence to support the claimant's complaints.

*Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). While they must consider each of these factors, known as the *Polaski* factors, the ALJ need not explicitly discuss each one. *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011). Further, "an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *Id.* An ALJ may reject a claimant's subjective complaints, however, based on "objective medical evidence to the contrary," *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002), or "inconsistencies in the record as a whole." *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003).

When an ALJ makes a credibility determination based on some erroneous inferences from the record, the reviewing court must decide whether the record "weighs so heavily against [the plaintiff's] credibility that the ALJ would necessarily have disbelieved [him or her] absent the erroneous inferences that [he or she] drew from the record." *Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008). In *Ford*, the Eighth Circuit found the ALJ properly relied on a lack of objective medical evidence to discount plaintiff's credibility. *See id.* at 982. However, the court also found the ALJ relied on perceived inconsistencies in plaintiff's report of her daily activities that were not actually inconsistent with her complaints of pain. *See id.* at 982-83. Since the remaining evidence did not "weigh[] so heavily against [plaintiff's] credibility that the ALJ would necessarily have disbelieved her absent the erroneous inferences," the Eighth Circuit remanded the case "to allow the ALJ to reconsider [plaintiff's] application based on a proper consideration of the

evidence." *Id.* at 983.

As discussed above, the ALJ in this case laid out the *Polaski* factors and stated he gave them careful consideration. Amongst those factors, the ALJ specifically addressed Key's daily activities but did not state whether these activities made her complaints more or less reliable. On the other hand, the ALJ explicitly stated his reliance on Key's "inconsistent work history," substantial gaps in treatment and non-compliance, and the lack of support from objective medical evidence in determining her subjective complaints lack credibility. (R. 202-204). Key argues the ALJ erred in making this credibility determination because there were no gaps in treatment or non-compliance, and she was working at the time of the accident. *Doc.* 11 at 3, 11. The Court will review each factor the ALJ relied upon in turn.

### i. Objective Medical Evidence

In making his credibility determination, the ALJ relied most heavily on his conclusion that "the objective medical evidence did not fully support the claimant's complaints." (R. 203). The ALJ found evidence for some limitation in Key's spine and left shoulder, but "no evidence of significant motor weakness, muscle atrophy, sensory loss or other significant neurological deficits." (R. 203). After walking through Key's treatment history for her spine and shoulder, he cited her August 17, 2017 follow-up visit with Dr. Pearson at UAMS which indicated "that the claimant's pain, range of motion and motor strength had improved." (R. 205).

While her medical records do note some limitations from injuries to her shoulders, neck, and back, none of her treating physicians made diagnoses that conclusively establish a source of chronic abdominal, neck, back, and shoulder pain at the levels that she describes. Thus, the ALJ's finding that Key's subjective complaints lack support in the objective medical evidence is supported by substantial evidence in the record.

### ii. Daily Activities

The ALJ also addressed Key's daily activities. The ALJ recited she could perform simple household tasks with frequent breaks, but her husband did the grocery shopping and performed the heavier chores. (R. 202). However, the ALJ did not determine whether this weighed for or against Key's complaints.

### iii. Work History

Next, the ALJ turned to what he described as Key's "inconsistent work history." (R. 203). The ALJ said the gaps in her employment "raised a question as to whether the claimant's continued unemployment was actually due to medical impairments rendering the claimant's allegations of debilitating pain and total disability less persuasive." (R. 203). However, Key said these gaps in employment were due to her becoming a stay-at-home mother and she intended to seek a full-time teacher position at Batesville School District before the accident. (R. 219, 230, 236, 564). The ALJ did not mention these justifications of the gaps in her employment in his findings, and he asked no further questions clarifying her work history at the hearing. Key's work history could serve as a reason for discrediting her subjective complaints, but without offering a good reason as to why he disregarded Key's justification for the gaps, it is unclear if the ALJ's determination is supported by substantial evidence in the record. *See Gregg*, 354 F.3d at 714 ("[i]f an ALJ explicitly discredits the claimant's testimony and *gives good reason for doing so*, [a court] will normally defer to the ALJ's credibility determination.") (emphasis added).

### iv. Gaps in Treatment and Non-Compliance

Most importantly, Key argues the ALJ erred in his credibility determination because "there were no gaps in treatment. The ALJ never cited to any evidence that supported his accusations that Plaintiff had gaps in treatment or that she was not compliant." *Doc.* 11 at 11. The Commissioner

concedes that "Plaintiff clearly received treatment throughout the relevant period." *Doc.* 13 at 4. However, the Commissioner argues finding gaps in Key's medical history was supported because "examination notes following Plaintiff's March 2017 shoulder surgery reveal she was making progress, her pain medication controlled her pain, she was advised to maintain her normal activities, and her range of motion was markedly better (Tr. 202-207, 792-793, 975-976, 1024, 1026). Significantly, she had no limitations in regard to her shoulder by June 2017 (Tr. 1018)." *Id.* While these treatment notes describing her progress are relevant to the question of whether Key's complaints align with the objective medical evidence, they do not support a finding of gaps in Key's medical treatment.

The ALJ did not cite to any evidence for his conclusion that there were "significant gaps in the treatment history." (R. 203). Upon this Court's review, there do not appear to be any significant gaps in Key's treatment history. As this Court recited, she frequently and consistently visited doctors to receive treatment for her shoulder, neck, and back pain between November 2016 and March 2018. Key also sought treatment options from different specialists and tried different approaches including physical therapy, surgery, massage therapy, spinal adjusting procedures, and perineural injection therapy. (R. 764, 885-901, 914-930, 1068). Therefore, substantial evidence does not support the ALJ's finding of gaps in her treatment. *See Donaldson v. Berryhill*, No. C16-0051-LTS, 2017 U.S. Dist. LEXIS 151859, at *9 (N.D. Iowa Sep. 19, 2017) ("Based on her review of the record, Judge Mahoney noted it was unclear what 'gaps in treatment' the ALJ relied on to discredit Donaldson because he did not cite any evidence… Judge Mahoney concluded that substantial evidence did not support the ALJ's conclusion that Donaldson's treatment for her physical impairments was inconsistent with her allegations related to pain."); *Shelly v. Astrue*, No. 4:11-CV-1122-CDP, 2012 U.S. Dist. LEXIS 57302, at *34 (E.D. Mo. Apr. 24, 2012) ("In finding Shelly less than credible, the ALJ pointed to gaps in treatment that would be inconsistent with

debilitating pain… However, the record here establishes no significant gaps.").

Likewise, the ALJ did not cite any evidence for his conclusion that there were "periods of non-compliance" in Key's treatment. (R. 203). The Court notes she did not take her prescribed muscle relaxers a few days after her accident because she was afraid of the side effects. (R. 824). Dr. Smith also told her in June 2017 that "she can be more aggressive with working on range of motion." (R. 1018). Beyond those instances, Key appeared to attend most of her follow-up appointments, (R. 758, 782, 916-930, 1012, 1017, 1022), got MRIs when she was told to, (R. 711, 727, 794), and attended all of her one-on-one physical therapy sessions. (R. 885, 887, 889, 895, 898, 899, 901). Thus, substantial evidence does not support the ALJ's conclusion that Key was non-compliant with her treatment.

### v. *Weighing the Factors*

Since the ALJ made an erroneous inference as to substantial gaps and non-compliance in Key's medical treatment, the Court must decide whether the remaining record "weighs so heavily against [Key's] credibility that the ALJ would necessarily have disbelieved [her] absent the erroneous inferences that [the ALJ] drew from the record." *Ford*, 518 F.3d at 983. In this case, the ALJ properly relied on a lack of support in the objective medical evidence in assessing Key's subjective complaints. However, while the lack of objective medical evidence is important, it alone cannot support the ALJ's finding. *See Buckner*, 646 F.3d at 558; *see also Ford*, 518 F.3d at 983 (remanding for reconsideration even when a lack of objective medical evidence supported the ALJ's credibility determination). Outside of the medical evidence, Key's work history does not weigh heavily against her since the ALJ did not explain why he disregarded her justification for gaps in her work history. Similarly, the ALJ never stated whether Key's daily activities were consistent or inconsistent with her complaints. Beyond these factors the ALJ explicitly discussed,

15

the Court finds no other evidence in the record as a whole that weighs heavily against the credibility of Key's complaints. Thus, the record does not weigh so heavily against Key's credibility that the ALJ would necessarily have disbelieved her absent the erroneous inferences surrounding gaps and non-compliance in her treatment, and remand is necessary for the ALJ to fully consider and reweigh the evidence in light of this opinion. *See Ford*, 518 F.3d at 983.

## V.     Conclusion

IT IS THEREFORE ORDERED that the final decision of the Commissioner is reversed and remanded for further proceedings consistent with this Order. This remand is a "sentence four" remand within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

SO ORDERED this 24th day of March, 2021.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE